Andrew Zollinger, State Bar No. 24063944
andrew.zollinger@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201-4629
Telephone: (214) 743-4500
Facsimile: (214) 743-4545

*Counsel for the Debtors*

Thomas R. Califano (admitted *pro hac vice*)
Dienna Corrado (admitted *pro hac vice*)
thomas.califano@dlapiper.com
dienna.corrado@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501

Daniel M. Simon (admitted *pro hac vice*)
daniel.simon@dlapiper.com
DLA Piper LLP (US)
One Atlantic Center
1201 West Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 736-7800
Facsimile:  (404) 682-7800

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| 4 West Holdings, Inc. *et al.*,[1] | § § | Case No. 18-30777 (HDH) |
| Debtors. | § § | (Jointly Administered) |

-------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| 4 WEST HOLDINGS, INC., *et al.*,[2] | § § | |
| Plaintiffs, | § § | ADV. PRO. _____ |
| v. | § § | |
| OMEGA HEALTHCARE INVESTORS, INC., *et al.*,[3] | § § § | |
| Defendants. | | |

---

[1]    A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, is attached hereto as **Exhibit A**.

[2]    A list of the Plaintiffs in this adversary proceeding is attached hereto as **Exhibit B**.

[3]    A list of the Defendants in this adversary proceeding is attached hereto as **Exhibit C**.

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff 4 West Holdings, Inc., et al., (collectively, the "Company" or "Plaintiffs"), certain above-captioned debtors (collectively, the "Debtors"), by and through their counsel, DLA Piper LLP (US), hereby submit this Complaint for Declaratory Judgment ("Complaint") against Omega Healthcare Investors, OHI Asset RO, LLC, and all Landlords within the Master Leases (as defined below) (collectively, "Defendants" or "Omega"), and respectfully represent as follows:

## NATURE OF THE COMPLAINT

1.      The Company seeks a declaratory judgment determining that the following agreements styled as master lease agreements are financing arrangements and not true operating leases:

> i.      **South East Region** - Master Lease, dated as of November 27, 2013, by and between certain Defendants and certain Company affiliates (as amended, the "SE Master Lease").  A copy of the SE Master Lease is attached hereto as **Exhibit D**.

> ii.      **Indiana Region** – Master Lease, dated as of November 27, 2013, by and between OHI Asset (IN) Connersville, LLC and Connersville RE, LLC (the "Indiana Master Lease," and together with the SE Master Lease, the "Master Leases").  A copy of the Indiana Master Lease is attached hereto as **Exhibit E**.

2.      All of the real property that is the subject of the SE Master Lease and the Indiana Master Lease are referred to herein as the "Subject Properties."

3.      The Company entered into the Master Leases as part of a sale/leaseback transaction (the "Sale Leaseback Agreement" and together with the Master Leases, the "Omega Transaction") pursuant to that certain Sale Leaseback Agreement, dated as of September 13, 2013, by and among OHI Asset RO, LLC, 4 West Holdings, Inc., and New Ark Investment,

Inc. (which merged into an entity now known as "Orianna Investment, Inc." which is a Debtor). A copy of the Sale Leaseback Agreement is attached hereto as **Exhibit F**.

4. At the time of the Omega Transaction, in addition to the SE Master Lease and the Indiana Master Lease, the Company entered into a master lease for facilities located in Texas (the "Texas Master Lease") and a master lease for facilities located in the North West (the "NW Master Lease"). At various times subsequent to the Omega Transaction, the Company transferred the facilities that are the subject of the Texas Master Lease and the NW Master Lease to new operators (together, the "Former Facilities"), and those master leases have since been terminated.

5. Although the Omega Transaction is labeled as a sale/leaseback, the parties intended that the transaction be a financing, as evidenced by the previous representations of the parties detailed below. In addition, as alleged in more detail below, the economic substance and terms of the Omega Transaction prove that it is a financing arrangement.

6. Moreover, in light of Omega's purported termination of the RSA[4] (as defined below), the Master Leases must be recharacterized as secured financings, which would grant the Debtors' ownership to each of the Subject Properties, which, in turn, would permit the Debtors to dispose of such assets for value, including but not limited to, (i) crediting valid secured claims asserted against the Debtors' estates, and (ii) selling such facilities for cash.

## JURISDICTION

7. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) and (b) and 11 U.S.C. § 157.

8. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[4] The Debtors reserve all rights to claims that Omega breached the RSA.

9.     The statutory bases for the relief requested herein are 28 U.S.C. § 2201 (the "Declaratory Judgment Act"), sections 105, 365, and 541 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## PARTIES

10.     The parties may be served in this adversary proceeding through the undersigned counsel.

## DEBTOR ENTITIES AND AFFILIATES

11.     4 West Holdings, Inc. ("4 West") is a Delaware corporation, with its principal place of business in Nashville, Tennessee. All of 4 West's affiliated debtors are incorporated under the laws of Delaware. As further described in detail below, the Debtors operate and/or manage skilled nursing facilities and do business under the name "Orianna."

12.     4 West wholly owns several subsidiary holding companies ("HoldCos"). The HoldCos, in turn, collectively own the interests in over 100 Tenant Debtors (as defined below) and Operating Debtors (as defined below). Generally speaking there is one Tenant Debtor and one Operating Debtor for each Facility operated by Debtors.

13.     The Operating Debtors hold licenses and other assets necessary to operate each Facility, and are certified to participate in Medicare and Medicaid programs.

14.     The Tenant Debtors are nominally "tenants" who pay "rent" to Omega subsidiaries with respect to the real property on which each respective Facility is operated.

## THE OMEGA DEFENDANTS

15.     Defendant Omega Healthcare Investors, Inc. ("OHI") is a Maryland corporation and is a publicly traded real estate investment trust ("REIT") that invests in SNFs.

16.     Defendant OHI Asset RO, LLC is a Delaware limited liability company and affiliate of OHI.

17.     The following Defendants are all affiliates of OHI and are nominal landlords under SE Master Lease:

    a.    OHI Asset (MS) Cleveland, LLC, a Delaware limited liability company;

    b.    OHI Asset (MS) Clinton, LLC, a Delaware limited liability company;

    c.    OHI Asset (MS) Columbia, LLC, a Delaware limited liability company;

    d.    OHI Asset (MS) Corinth, LLC, a Delaware limited liability company;

    e.    OHI Asset (MS) Byhalia, LLC, a Delaware limited liability company;

    f.    OHI Asset (MS) Greenwood, LLC, a Delaware limited liability company;

    g.    OHI Asset (MS) Grenada, LLC, a Delaware limited liability company;

    h.    OHI Asset (MS) Holly Springs, LLC, a Delaware limited liability company;

    i.    OHI Asset (MS) Indianola, LLC, a Delaware limited liability company;

    j.    OHI Asset (MS) Natchez, LLC, a Delaware limited liability company;

    k.    OHI Asset (MS) Picayune, LLC, a Delaware limited liability company;

    l.    OHI Asset (MS) Vicksburg, LLC, a Delaware limited liability company;

    m.    OHI Asset (MS) Yazoo City, LLC, a Delaware limited liability company;

    n.    OHI Asset (SC) Edgefield, LLC, a Delaware limited liability company;

    o.    OHI Asset (VA) Charlottesville, LLC, a Delaware limited liability company;

    p.    OHI Asset (VA) Farmville, LLC, a Delaware limited liability company;

    q.    OHI Asset (VA) Hillsville, LLC, a Delaware limited liability company;

    r.    OHI Asset (VA) Rocky Mount, LLC, a Delaware limited liability company;

    s.    OHI Asset (SC) Pickens East Cedar, LLC, a Delaware limited liability company;

t.      OHI Asset (SC) Greenville North, LLC, a Delaware limited liability company;

u.      OHI Asset (SC) Simpsonville SE Main, LLC, a Delaware limited liability company;

v.      OHI Asset (SC) Easley Crestview, LLC, a Delaware limited liability company;

w.      OHI Asset (SC) Easley Anne, LLC, a Delaware limited liability company;

x.      OHI Asset (SC) Piedmont, LLC, a Delaware limited liability company;

y.      OHI Asset (SC) Greenville Laurens, LLC, a Delaware limited liability company;

z.      OHI Asset (SC) Anderson, LLC, a Delaware limited liability company;

aa.     OHI Asset (SC) Simpsonville West Curtis, LLC, a Delaware limited liability company;

bb.     OHI Asset (SC) Simpsonville West Broad, LLC, a Delaware limited liability company;

cc.     OHI Asset (SC) Pickens Rosemond, LLC, a Delaware limited liability company;

dd.     OHI Asset (SC) Aiken, LLC, a Delaware limited liability company;

ee.     OHI Asset (SC) Greer, LLC, a Delaware limited liability company;

ff.     OHI Asset (SC) Marietta, LLC, a Delaware limited liability company;

gg.     OHI Asset (SC) McCormick, LLC, a Delaware limited liability company;

hh.     OHI Asset (TN) Bartlett, LLC, a Delaware limited liability company;

ii.     OHI Asset (TN) Collierville, LLC, a Delaware limited liability company;

jj.     OHI Asset (GA) Snellville, LLC, a Delaware limited liability company;

kk.     OHI Asset (GA) Moultrie, LLC, a Delaware limited liability company;

ll.     OHI Asset (NC) Wadesboro, LP (f/k/a OHI Asset (NC) Wadesboro, LLC), a Delaware limited partnership;

mm.     OHI Asset (TN) Memphis, LLC, a Delaware limited liability company;

nn. OHI Asset (SC) Greenville Griffith, LLC, a Delaware limited liability company;

18. The following Defendant is an affiliate of OHI and is a nominal landlord under the Indiana Master Lease:

a. OHI Asset (IN) Connersville, LLC, a Delaware limited liability company;

## FACTS

### A. Overview of the Company

19. As of March 6, 2018 (the "Petition Date"), 4 West and its affiliated Debtors operated 41 skilled nursing facilities located in the six states of Georgia, Mississippi, North Carolina, South Carolina, Tennessee and Virginia (each, a "Facility")[5] and is the manager of a Facility in Indiana. As of the Petition Date, the Debtors employed approximately 5,000 employees, including but not limited to, nurses, nursing assistants, social workers, regional directors and supervisors.

20. The activities and business affairs of the Debtors generally fall into three categories: (i) holding companies that directly or indirectly hold a portfolio of certain assets, (ii) entities that are tenants under the Master Leases with the Omega Parties (the "Tenant Debtors"), and (iii) entities which are subtenants under the subleases with the Tenant Debtors and operate the Facilities (the "Operating Debtors").[6] The Master Leases serve as financing arrangements pursuant to which the Company is to repay the funds borrowed from the Defendants under the Sale Leaseback described below.

---

[5] As discussed in further detail below, since the Petition Date and as of the date hereof, thirteen of the Facilities have been transferred to new operators designated by the Defendants pursuant to the 9019 Settlement.

[6] Debtor Johns' Island Rehabilitation and Healthcare Center, LLC is an Operating Debtor but its lease is with a third party, Sea Island Comprehensive Health Care, Corp. Debtor Palladium is a separately licensed hospice and palliative care services provider that is wholly owned by Debtor Orianna Investment, Inc.

**B.**      **2013 Merger and the Omega Transaction**

21.      4 West was formed in August 2013 in connection with the acquisition by merger (the "Merger") of Ark Holding Company, Inc. d/b/a Covenant Dove ("AHC")[7] pursuant to that certain Agreement and Plan of Merger, dated September 13, 2013 (the "Merger Agreement"), by and among 4 West Holdings, New Ark Investment, Inc. ("Acquisition Sub"), AHC, and Behrman Capital PEP L.P. ("Berhman Capital"), the previous owner of AHC.  Upon the merger of Acquisition Sub with and into AHC, AHC remained as the surviving corporation, which is now known as Orianna Investment, Inc., a Debtor in these Chapter 11 Cases.

22.      The Merger was prompted by Berhman Capital's decision to exit its investment in AHC.  Berhman Capital retained an investment banking firm, Jefferies LLC, to assist with marketing the sale.  Jeffries LLC identified Omega, a publicly traded REIT that invests in skilled nursing facilities and assisted living facilities in the United States and United Kingdom, as a potential buyer.

23.      Upon information and belief, Omega was eager to enter the Omega Transaction and believed it would serve as a prototype for future large portfolio acquisitions.  Upon information and belief, Omega saw the transaction as an opportunity to add considerable size and diversity to its portfolio, including facilities in four states in which Omega did not previously have a presence.

24.      The closing of the Merger was conditioned upon the consummation of the Sale Leaseback Agreement with OHI Asset RO, LLC,[8] which provided the Company with the funds

---

[7]      AHC was formed in 2007 by a private equity firm, Behrman Capital, to provide long-term care and rehabilitation services primarily in the Southeast region of the United States.

[8]      OHI Asset RO, LLC is also the entity providing the Debtors with debtor-in-possession financing in these chapter 11 cases.

necessary to pay the Merger consideration.  While fashioned as a purchase of the facilities by OHI Asset RO, LLC, the Sale Leaseback Agreement was actually a loan agreement and the Master Leases were the vehicles through which the loan would be repaid.  Under the Sale Leaseback Agreement, the Debtors purportedly sold the real property to the Defendants for $525 million.

25.    On September 13, 2013, the Company and the Defendant entered into the following transactions executed simultaneously: (a) the Merger Agreement; (b) the Sale Leaseback Agreement, and (c) the Master Leases.  The transaction between the Debtors and Defendants is sometimes referred to as the "Omega Transaction."

26.    Pursuant to the Omega Transaction, Omega loaned to the Company a total of $525 million.  The immediate proceeds of the Omega Transaction were used to pay, among other things, the indebtedness of the surviving corporation, ACH, and the merger consideration to the ACH's shareholders.  Omega purportedly acquired the Subject Properties (and the Former Facilities) specifically for the sole purpose of leasing such properties to the Debtors to operate as skilled nursing facilities.

C.    **The Company's Global Settlement with Omega**

27.    Since 2015, the Company faced financial difficulties caused, in part, by a decline in performance of skilled nursing facilities within its current portfolio as a result of a variety of industry-wide developments and its obligations to Omega under the Master Leases which were significantly higher than their operating income could support.

28.    In the months leading up to the Petition Date, the Company engaged in comprehensive settlement negotiations with OHI Asset RO, LLC (collectively with certain of its affiliates and subsidiaries, "Omega") and SC-GA 2018 Partners, LLC as proposed plan sponsor (the "Plan Sponsor") regarding a global settlement related to a myriad of legal and

financial issues confronting the Debtors. Among other issues, the parties sought to address (i) potential recharacterization of the Debtors' Master Leases as secured financing arrangements; (ii) funding of cases through debtor in possession financing; (iii) agreed-upon reduction of rent payments during the pendency of the chapter 11 cases; and (iv) agreement to support a transaction with the Plan Sponsor to provide a path towards confirmation of a chapter 11 plan.

29.     These discussions culminated with the entry into three key agreements:

   a.     Restructuring Support Agreement [Docket No. 331-3] (as amended, the "RSA"), which was approved by the Court pursuant to the *Order Authorizing the Debtors' Assumption of the Restructuring Support Agreement* entered on June 4, 2018 [Docket No. 506] (the "RSA Order");

   b.     Amended Settlement Agreement [Docket No. 375-1] (as amended, the "9019 Agreement"), which was approved by the Court pursuant to the *Order (I) Approving Amended Settlement Agreement, and (II) Granting Related Relief* entered on May 14, 2018 [Docket No. 375] (the "9019 Order");[9] and

   c.     Senior Secured Superpriority Debtor-in-Possession Credit Agreement [Docket No. 18-3] (as amended, the "Credit Agreement"), which was approved by the Court on a final basis pursuant to the *Final Order: (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; and (III) Granting Related Relief* entered on May 14, 2017 [Docket No. 376] (the "DIP Order").

30.     The RSA and the 9019 Agreement contemplated (i) the transfer of twenty-two of the Company's facilities to new operators designated by Omega (the "Transfer Portfolio") and (ii) the sale of the remainder of the Company's facilities and its hospice unit (the "Restructuring Portfolio") to the Plan Sponsor serving as the stalking horse under a Stock Purchase Agreement and implemented through a chapter 11 plan of reorganization.

---

[9]     The 9019 Order is currently on appeal to the United States District Court for the Northern District of Texas, styled as *The Official Committee of Unsecured Creditors, et al. v. 4 West Holdings Inc., et al.*, Case No. 3:18-cv-01310-B.

31.     Only one of these transactions—the Transfer Transaction—has closed, with approximately 60% of the Transfer Portfolio already transitioned to operators designated by Omega, with the balance of the Transfer Portfolio currently in the process of transfer. Additionally, the Debtors' former headquarters in Memphis has been sold with the proceeds of such sale having been paid to Omega. Following Omega's purported termination of the RSA (a termination which the Debtors believe is improper and directly attributable to conduct by Omega), the Debtors are forced to seek the recharacterization of the Master Leases (as defined below).

**D.     The Intent of the Parties**

32.     The clear intent of the Defendant was for the Omega Transaction to be a financing, as evidenced both by the terms of the Master Leases as well as by statements made by Defendant contemporaneous with the Omega Transaction.

33.     The intent of the Company was for the Omega Transaction to be a financing, as evidenced both by the terms of the Master Leases as well as by statements made by the Company contemporaneous with the Omega Transaction.

**E.     The Tax Treatment of the Master Leases Confirm They Are a Financing Arrangement**

34.     Based on the guidance of outside tax counsel, the Company filed a Net Gain Form 4797 with the IRS in connection with its 2013 tax returns, characterizing the Omega Transaction as a financing arrangement.

35.     In related correspondence, the IRS confirmed that the treatment of the Omega Transaction as a financing arrangement was appropriate, and sought additional information to confirm that the Company maintained the burdens of ownership after the transaction. *See*

Email from R. Deboise to A. Whitlock, "Requests" (Sept. 21, 2015 at 3:37 p.m.), a true and correct copy of which is attached hereto as **Exhibit G**.

36.     In responding to the IRS inquiry, Defendant and the Company jointly submitted the following information, confirming the Omega Transaction is a financing arrangement:

*Does Omega Healthcare retain significant control over the leased property?*

No. Omega Healthcare does not retain significant control over the leased property. The tenant under each of the four (4) Master Lease Agreements (each, a "Master Lease") was granted the right to exclusively occupy the premises until November 30, 2063 (See Section 1.3 of the Master Lease). Additionally, at the conclusion of the lease term the tenant under each Master Lease has an option to purchase the leased property for $10.00 (See definition of "Tenant Buyout Price" in Section 1.4 of the Master Lease). The tenant is solely responsible for all maintenance and repair of the leased premises, and for the payment of all utilities, taxes, fees and other impositions applicable to ownership of the leased property during the term of the Master Lease (See Article 3 of the Master Lease).

*Did Omega Healthcare acquire an equity interest in the property?*

Omega holds legal title to the property, but does so solely to provide security for the repayment of the loan by the tenant. Omega does not have any equity or residual interest in the property from a substantive or economic standpoint.

*Is Omega Healthcare vested with the right of possession?*

No. Omega Healthcare is not vested with the right of possession of the property. The tenant has the sole right to occupy the leased premises during the lease term. (See Section 1.1 and 21.1 of the Master Lease).

*Which party pays property taxes after the transaction?*

The tenant is responsible to pay all taxes applicable to the leased premises during the lease term. (See Sections 3.1 and 3.2 of the Master Lease).

*Which party bears the risk of economic loss or physical damage to the property?*

The tenant bears the cost of repair for damage to or destruction of the leased property (See Section 9.1, 9.4 and 9.10 of the Master Lease). Section 9.4 of the Master Lease requires the tenant to repair, rebuild or restore any damaged property at the tenant's expense. Section 9.5 requires the tenant to deposit with the landlord any amount needed for repairs in excess of insurance proceeds. In addition, there is no rent abatement as a result of any damages to the property.

*See id.*

**F.** **The Terms of Each of the Master Leases Confirm They Are Financing Arrangement**

37.     The following provisions in the Master Leases demonstrate that the parties in fact intended for the transaction to be a financing arrangement.

### 1. Rental Payments Were Calculated to Ensure Particular Return on Omega's Investment, Not for Use of Real Property

38.     The payments required to be made by the Company to the Defendant under the Master Leases were computed to provide the Defendant with a return on its $525 million loan. The South East Master Lease and Indiana Master Lease include amortization schedules, which is akin to a secured financing.  *See* Ex. D Sched. 2;  Ex. E Sched. 2.

39.     Notably, Omega's 10-K for 2016 (the "2016 Omega 10-K"), which is attached hereto as **Exhibit H**, states:

> "[o]n November 27, 2013, we closed an aggregate $529 million purchase/leaseback transaction in connection with the acquisition of Ark Holding Company, Inc. ("Ark Holding") by 4 West Holdings Inc. At closing, we acquired 55 SNFs and 1 ALF operated by Ark Holding and leased the facilities back to Ark Holding, now known as New Ark Investment Inc. ("New Ark"), pursuant to four 50-year master leases with **rental payments yielding 10.6% per annum over the term of the leases. The purchase/leaseback transaction is being accounted for as a direct financing lease**. The [Master Leases] allow the tenant the right to purchase the facilities for a bargain purchase price plus closing costs at the end of the lease term.  **In addition, commencing in the 41st year of each lease, the tenant will have the right to prepay the remainder of its obligations thereunder for an amount equal to the sum of the unamortized portion of the original aggregate $529 million investment plus the net present value of the remaining payments under the lease and closing costs.** In the event the tenant exercises either of these options, we have the right to purchase the properties for fair value at the time. . . . Additionally, **we own** four facilities and lease them to New Ark under [the Laurel Baye] master lease which expires in 2026. The four facility lease is being accounted for as an operating lease."

*See* Ex. H p. F-27.

40.     Significantly, Omega's language with respect to the Laurel Baye Master Lease (which the Debtors admit is a true operating lease and is not subject of the Adversary Complaint) contrasts with the description of the other properties with the Debtors and with

respect to which it only has a purchase option to purchase at fair market value at the end of the lease. Ex. F p. F-41.

### 2. The "Rent" was Calculated Based on the Amount the Company Borrowed, and Not Fair Market Value of the Subject Properties

41. The payments made by the Tenant Debtors to Omega under the Master Leases were calculated based on the amount the Company borrowed to obtain the Subject Properties and not based on the fair market rental value of the Subject Properties.

42. The payments required to be made by the Company to Omega under the Master Leases were payments of interest on the $525 million loan from the Defendant.

43. The SE Master Lease and Indiana Master Lease include amortization schedules, which indicate a secured financing arrangement. *See* Ex. D Sched. 2; Ex. E Sched. 2. Additionally, each of the Master Leases state that the "rent" should be considered payment of interest and principal under the Master Leases for tax purposes. *See* Ex. D § 23.1; Ex. E § 23.1.

44. These provisions show that the Defendant computed the payments to earn a return on its investment, which is another indication that the Omega Transaction is a financing and not a lease.

45. This is further evidenced by Omega's disclosures in its 10-K for 2016 referenced *supra*. As stated above, Omega's use of the language "we own" only with respect to the Laurel Baye lease indicates that Omega does <u>not</u> own the other Subject Properties which Omega only has a purchase option to purchase at fair market value at the end of the Leases. *See* Ex. D § 12.10; Ex. E § 12.10.

46. Furthermore, at least with respect to the SE Master Lease, Omega previously sold one of the facilities that was leased under the SE Master Lease and at around the same

time funded renovations to another one of the facilities under that same Master Lease. *See* Ex. D Recitals. The rent was adjusted to reflect an increase on account of the funding and a decrease in the amount of the sale proceeds. *See* Ex. D §4. This demonstrates that (a) an actual loan was issued through the lease, and (b) the tenant received the value of the sale proceeds as a true owner would.

### 3. The Facilities Were Purchased Specifically for the Debtors to Operate

47. Omega acquired all of the property that is the subject of the SE and Indiana Master Leases pursuant to the Sale Leaseback Transaction specifically for the purpose of leasing it back to the Company. *See* Ex. D Recitals; Ex. E Recitals.

### 4. The Omega Transaction Was Structured to Secure Certain Tax Advantages

48. In addition to the tax treatment of the Master Leases specifically state that the transaction was entered into in order to secure certain tax advantages. Each of the Master Leases state that the "rent" should be considered payment of interest and principal under the Master Leases for tax purposes. Specifically, such leases provide that the "Sale Leaseback Agreement together with this lease shall be treated by the Parties for (i) all federal, state and local income tax purposes as a secured financing arrangement, and (ii) GAAP accounting purposes as a capital lease." See Ex. D § 23.1; Ex. E § 23.1.[10]

49. Article 23 of the Master Leases provide, in pertinent part, that:

23.1 <u>Tax Treatment of Lease.</u> Landlord and Tenant hereby acknowledge and agree, and covenant that the acquisition of the Leased Property pursuant to the Sales Leaseback Agreement together with this Lease shall be treated by the Parties for (i) all federal, state and local income tax purposes as a secured financing agreement, and (ii) GAAP accounting purposes as a capital lease. As such, Landlord and Tenant shall, for all federal, state and local income tax purposes, treat (a) the amounts paid by the Landlord in

---

[10]    A memorandum from the law firm of Greenberg Traurig to Trey Blalock dated July 25, 2013 (the "<u>GT Memo</u>"), annexed hereto as **Exhibit I**, shows that tax considerations were taken into account in structuring the transaction.

connection with the acquisition of the Leased Property as a loan to the Tenant, (b) Landlord and Tenant shall classify and characterize all payments of Rent made hereunder as payments of principal and interest in accordance with the amortization schedule as initially set forth on Schedule 2 attached hereto…(c) Tenant shall continue to claim depreciation with respect to the Lease Property based on its historic tax books and records, and (d) Landlord and Tenant shall file all income tax return or associated documents on a basis consistent with such classification and characterization.

50.     The characterization of the Company's payments under the Master Leases as interest indicates that the each Master Lease is a financing and not a true lease.

51.     Furthermore, the 2016 Omega 10-K also states that, generally, it enters into its lease transactions for tax purposes and that there is a risk that the Internal Revenue Service can seek to treat such leases as "secured financing transactions in which the lessees are owners of the facilities and [Omega is] merely a secured creditor." Ex. H p. 11.

52.     With respect to the Sale Leaseback Agreement, the 2016 Omega 10-K specifically states that SE Master Lease and Indiana Master Lease are subject to a "direct financing lease." Ex. H p. F-27.

**5.     The Tenant Debtors Assume Many of the Obligations Normally Associated With Outright Ownership.**

53.     Under Section 1.3 of the Master Leases, the Company was given the right to exclusively occupy the Property until November 30, 2063.

54.     Additionally, under the Master Leases, the Tenant Debtors bear the risk of loss in the event of casualty or condemnation, and are required to repair, rebuild or restore any damaged property at the Company's expense. The Master Leases provide, in pertinent part, that in the event of a casualty:

9.4   Restoration.   Tenant shall promptly repair, rebuild, or restore the damaged Leased Property, at Tenant's expense, so as to make the Leased Property at least equal in value to the Leased Property existing immediately prior to such occurrence and as nearly similar to it in character as is practicable and reasonable.

55.     Moreover, the Company is required to deposit with the Defendant any amount needed for repairs in excess of applicable insurance proceeds.

9.5     <u>Insufficient Proceeds.</u>        If the proceeds of any insurance settlement are not sufficient to pay the costs of Tenant's repair, rebuilding or restoration under §9.4 in full, Tenant shall deposit with Landlord at Landlord's option, and within 10 days of Landlord's request, an amount sufficient in Landlord's reasonable judgment to complete such repair, rebuilding, or restoration.  Tenant shall not, by reason of the deposit or payment, be entitled to any reimbursement from Landlord or diminution in or postponement of payment of the Rent.

56.     The Company is not provided any abatement in rent as a result of any such losses.

57.     These obligations assumed by the Company reflect ownership in the Subject Properties and indicate that the Omega Transaction is a financing and not a lease.

58.     The Tenant Debtors are also required to pay, among other things, the amounts owed for "impositions", and require the Tenant Debtors' payment of, among other things, taxes, assessments, utilities, insurance, taxes and maintenance.  In pertinent part, the Master Leases provide that:

## <u>ARTICLE 3: IMPOSITIONS AND UTILITIES</u>

3.1     <u>Payment of Impositions.</u>    Tenant shall pay, as Additional Rent, all Impositions that may be levied or become a lien on the Leased Property or any part thereof at any time (whether prior to or during the Term), without regard to prior ownership of said Leased Property, before any fine, penalty, interest, or cost is incurred; provided, however, Tenant may contest any Imposition in accordance with §3.7.

*        *        *

3.4     <u>Utilities.</u>        Tenant shall pay, as Additional Rent, all taxes, assessments, charges, deposits, and bills for utilities, including, without limitation, charges for water, gas, oil, sanitary and storm sewer, electricity, telephone service, and trash collection, which may be charged against the occupant of the Improvements during the Term.

3.5     <u>Discontinuance of Utilities.</u>    Landlord will not be liable for damages to person or property or for injury to, or interruption of, business for any

discontinuance of utilities nor will such discontinuance in any way be construed as an eviction of Tenant or cause an abatement of rent or operate to release Tenant from any Tenant's obligations under this Lease.

3.5     Business Expenses.     Tenant acknowledges that it is solely responsible for all expenses and costs incurred in connection with the operation of the Facility on the Leased Property, including without limitation, employee benefits, employee vacation and sick pay, consulting fees, and expenses for inventory and supplies.

*     *     *

## ARTICLE 4: INSURANCE

4.1     General Insurance Requirements.     At all times through the Term of this Lease, Tenant shall, at Tenant's sole cost and expense, maintain or cause to be maintained the following insurance coverages with respect to the Premises:

(a) Property insurance against loss or damage caused by fire, casualty and other hazards covered by an "all-risk" or "special" cause of loss policy…

*     *     *

(b)     Business income or business interruption insurance, including rental value/leasehold interest coverage, and "Extra Expense" coverage, applicable at least to the same perils covered by the property insurance required pursuant to Section 4.1(a) above…

*     *     *

## ARTICLE 7: MAINTENANCE AND MECHANICS' LIENS

7.1     Maintenance.     Tenant shall maintain, repair, and replace the Leased Property, including, without limitation, all structural and nonstructural repairs and replacements to the roof, foundations, exterior walls, HVAC systems, equipment, parking areas sidewalks, water, sewer and gas connections, pipes and mains. Tenant shall pay, as Additional Rent, the full cost of maintenance, repairs, and replacements.     Tenant shall maintain all drives, sidewalks, parking areas, and lawns on or about the Leased Property in a clean and orderly condition, free of accumulations of dirt, rubbish, snow and ice.

7.2     Required Alterations.          Tenant shall, at Tenant's sole cost and expense, make any additions, changes, improvements or alternations to the Leased Property, including structural alterations, which may be required by any governmental authorities, including those required to maintain licensure or certification under the Medicare and Medicaid programs (if so certified), whether such changes are required by Tenant's use, changes in the law, ordinances, or

governmental regulations, defects existing as of the date of this Lease, or any other cause whatsoever.

59. As required under the Master Leases, the Tenant Debtors have paid the taxes, utilities, insurance, and maintenance.

60. These obligations assumed by the Tenant Debtors reflect ownership in the property and indicate that the Omega Transaction is a financing and not a lease.

61. Furthermore, one of the Debtors' facilities located in Colliersville, Tennessee that is leased from an Omega Landlord under the South East Master Lease is also the subject to a ground lease between the ground landlord and Omega. *See* Ex. D § 25.27. The South East Master Lease provides that the tenant must pay all amounts due under the ground lease directly to the ground lease landlord. *See id.*

### 6. The Company Bears the Risk of Loss.

62. In each of the Master Leases, the risk of loss is on the Tenant Debtors in the event of a casualty or condemnation. After condemnation or destruction of the Properties, the Master Leases do not permit the tenants to abate any amount of rent, even though they will not be receiving full, or potentially any, beneficial use of the property. *See* Ex. D §§ 9.9, 9.10, 10.4; Ex. E §§ 9.9, 9.10, 10.4.

63. Further, if a casualty or complete taking destroys the entire property, or results in the tenant not being able to use the property for the purposes it was previously used for, for 120 days following such event, the Master Leases require the Tenant Debtors to submit an irrevocable, rejectable written offer to purchase the Omega landlord's interest in the property, which purchase price to be equal to the "Facility Transfer Price" or "Offer Price" as of a specified proposed purchase date. Such price is equal to the current month's rent, plus the net

present value of the remaining base rent, plus Omega's costs and expenses of the transfer. *See* Ex. D §§ 9.10, 10.4; Ex. E §§ 9.10, 10.4.

### 7. The Economic Value of the Subject Properties is Exhausted at the End of the Master Leases.

64.     The SE Master Lease and Indiana Master Lease are both long term (50 year) leases. *See* Ex. D § 1.3; Ex. E § 1.3. Moreover, as described in further detail below, the Tenant Debtors have a purchase option after forty (40) years for a nominal $10.00. Forty (40) years is approximately the useful life of the Facilities.[11]

### 8. The Company Has the Purchase Option for a Nominal Amount At the End of Lease Term.

65.     The SE Master Lease and Indiana Master Lease each contain a purchase option in favor of the Tenant Debtors, which permit the Tenant Debtors to purchase the Facilities after 40 years with the purchase price calculated to include the remaining lease payments plus certain fees and expenses. *See* Ex. D §§ 12.3, 12.4; Ex. E §§ 12.3, 12.4.

66.     The Master Leases provide, in pertinent part, that:

12.1 <u>Tenant Option to Purchase</u>. In consideration of the execution of the Lease, subject to the terms and conditions set forth below, Landlord hereby grants to Tenant the option (the "<u>Tenant Option</u>") to buy the Tenant Option Property (as that term is defined below) in accordance with, and subject to the terms and conditions of, this Article. The Tenant Option may be exercised only with respect to all of the Tenant Option Property, and may not be exercised in part or with respect to less than all the Tenant Option Property. In addition, in order to exercise the Tenant Option, the "Tenant Option" under each of the Related Leases must be exercised concurrently with the Tenant Option.

12.2 <u>Option Property.</u> The "<u>Tenant Option Property</u>" means all of the Landlord's right, title and interest in the Leased Property but excluding [certain items].

---

[11]     The GT Memo states that "[t]he proposal from Omega includes a provision that at the end of the 40 year term, beneficial ownership of the real estate would effectively be transferred and legal title would remain with Omega. Omega has argued that the useful life of the property is 40 years, and that, as a result, the value of the property at the end of 40 years is zero." *See* Ex. G.

12.3 <u>Exercise of Option</u>.  During the Term, Tenant may exercise the Tenant Option at any time after the end of the fortieth (40th) Lease Year and prior to ninetieth (90) day prior to the end of the Term (the "<u>Tenant Option Period</u>"); provided, however, that Tenant may not exercise the Tenant Option at any time when an Event of Default or Unmatured Event of Default has occurred or is continuing.  Tenant shall exercise the Tenant Option by delivering Notice thereof to Landlord during the Tenant Option Period, together with a non-refundable deposit in the amount of equal to five percent (5%) of the Tenant Buyout Price (the "<u>Tenant Option Deposit</u>").  The Tenant Option Deposit shall be deemed to be fully earned by Landlord upon Landlord's receipt thereof, and shall only be returned to Tenant under certain circumstances as more particularly set forth below.

12.4 <u>Buyout Price.</u>  If Tenant exercises its option to purchase the Tenant Option Property as set forth in this Lease, the purchase price for the Tenant Option Property shall be the Tenant Buyout Price.  The Tenant Buyout Price shall be payable by Tenant in immediately available funds at closing.  The Tenant Option Deposit shall be applied against the Tenant Buyout Price at closing. Tenant shall also pay the cost of any revenue or transfer stamps required to be affixed to the deeds, and all reasonable expenses, disbursements and reasonable attorneys' fees incurred by Landlord in the sale transaction.

67.    Significantly, if the sale closes in the last month of the lease term, the purchase price is a nominal amount of $10.  *See id.* §§ 12.3, 12.4.  The fact that the purchase price is linked to the remaining lease payments demonstrates that the lease payments were calculated to compensate the purported "landlord" for the cost of the land and not the fair market value of use of such property.

68.    Moreover, if a Tenant Debtor exercises its purchase option, the applicable "Omega Landlord" may buy the Tenant Debtor's rights under the option for fair market value of the property.  *See id.* § 12.10.  The fact that the Omega Landlord would have to pay fair market value of the property indicates that the property is owned by the Tenant Debtors and that the Omega Landlord is in fact exercising an option to purchase from the Tenant Debtors.

69.    The nominal Option Purchase Price is indicative of a financing and not a lease.

### G. Statements Made by Omega Confirm That It Intended For The Master Leases To Be Treated As Financing Arrangement

70. Omega's principals have made several statements indicating that Omega did not believe that they owned the properties but rather was financing them for the Company as owners.

71. On August 14, 2013, Taylor Pickett, Chief Executive Officer of Defendant Omega Healthcare Investors, Inc. stated in an e-mail to Harris Schwartzberg that the transaction was a "lease finance structure" and stated that "Jeffries … have scheduled a call with our lawyers to make sure they understand that *it is a financing* (via a capital lease)" (emphasis added). *See* **Exhibit J**.

72. On September 13, 2013, Eliot Robinson, an attorney for Defendants, stated in an e-mail to Taylor Pickett and others relating to the proposed sale-leaseback transaction "*Omega is providing the financing*." (emphasis added). *See* **Exhibit K**.

73. On September 30, 2015, Vikas Gupta, on behalf of Defendants, stated in an e-mail to Raymond Mulry that he recommended making the following statement in response to a question from the IRS relating to the transaction "Omega holds legal title to the property, *but does so solely to provide security for repayment of the loan by the tenant*. Omega does not have any equity or residual interest in the property form a substantive or economic standpoint." (emphasis added). *See* **Exhibit L**.

### COUNT I
**(Declaratory Judgment for Recharacterization of the Master Leases as Financing Arrangements under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57)**

74. The Company incorporates the allegations set forth in the foregoing paragraphs as if set forth in full below.

75.     This claim for relief arises under the Federal Declaratory Judgment Act, 27 U.S.C. § 2201.

76.     The economic realities of the Omega Transaction and the terms of the agreements prove that the relationship between the Defendant and the Company is a borrower/lender relationship and not a lessee/lessor relationship.

77.     The parties intended the Master Leases to be financing arrangements and not leases.

78.     The Subject Properties were "purchased" by Omega for the Company's use to operate as skilled nursing facilities.

79.     The tax treatment of the Master Leases confirms that such transactions were financing arrangements and not leases.

80.     The terms of the Masters Leases confirm that they are financing arrangements and not leases: (i) the payments under the Master Leases were interest payments and were computed to provide the Defendant with a return on its investment; (ii) the "rent" was calculated based on the amount the Company borrowed and not the fair market rental value of the Subject Properties; (iii) the Subject Properties were purchased specifically for the Company to operate; (iv) the Master Leases were structured as direct financing leases to secure certain tax advantages; (v) the Company assumes many of the obligations normally associated with outright ownership; (vi) the Company bears the risk of loss; (vii) the economic value of the Subject Properties is exhausted at the end of the Master Leases; and (viii) the Company has the option to purchase for a nominal amount at the end of the Subject Leases.

81.     All of these facts and provisions demonstrate that each of the SE Master Lease and the Indiana Master Lease is a financing and not a lease.

82.     Therefore, Plaintiffs seek a declaratory judgment that the Master Leases are actually secured financing agreements, not "leases" as that term is used in section 365 of the Bankruptcy Code and that Defendants are secured creditors of the Debtors, and not lessors.

## PRAYER FOR RELIEF

WHEREFORE, the Debtors respectfully request that upon final hearing, a judgment be entered as follows:

A.     Declaring that the SE Master Leases and the Indiana Master Lease, attached hereto as Exhibits D and E, are each a financing, not a lease;

B.     Granting the Debtors such other and further relief as the Court may deem just and proper.

Dated:  July 27, 2018
Dallas, Texas

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Andrew Zollinger*
Andrew Zollinger, State Bar No. 24063944
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas  75201-4629
Telephone:  (214) 743-4500
Facsimile:  (214) 743-4545
Email:  andrew.zollinger@dlapiper.com

-and-

Thomas R. Califano (admitted *pro hac vice*)
Dienna Corrado (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
Email:  thomas.califano@dlapiper.com
          dienna.corrado@dlapiper.com
-and-

Daniel M. Simon (admitted *pro hac vice*)
One Atlantic Center
1201 West Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 736-7800
Facsimile: (404) 682-7800
Email: daniel.simon@dlapiper.com

*Counsel for the Debtors*

## EXHIBITS

| | |
|---|---|
| **Exhibit A** | A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number. |
| **Exhibit B** | A list of the Plaintiffs in this adversary proceeding. |
| **Exhibit C** | A list of the Defendants in this adversary proceeding. |
| **Exhibit D** | South East Region Master Lease, dated as of November 27, 2013, by and between certain Defendants and certain Company affiliates (as amended). |
| **Exhibit E** | Indiana Region Master Lease, dated as of November 27, 2013, by and between OHI Asset (IN) Connersville, LLC and Connersville RE, LLC. |
| **Exhibit F** | The Sale Leaseback Agreement, dated as of September 13, 2013, by and among OHI Asset RO, LLC, 4 West Holdings, Inc., and New Ark Investment, Inc. (which merged into an entity now known as "Orianna Investment, Inc." which is a Debtor). |
| **Exhibit G** | Email from R. Deboise to A. Whitlock, "Requests" (Sept. 21, 2015 at 3:37 p.m.). |
| **Exhibit H** | Omega's 10-K for 2016 |
| **Exhibit I** | Legal Memorandum from Greenberg Traurig to Trey Blalock, dated July 15, 2013 |
| **Exhibit J** | Email from T. Pickett to H. Schwartzberg, "Merger Agreement Update" (August 14, 2013 at 2:45 p.m.). |
| **Exhibit K** | Email from E. Robinson to D. Booth, T. Pickett, B. Stephenson, "RE: OHI 8K TIMING" (Sept. 13, 2013 at 3:17 p.m.). |
| **Exhibit L** | Email from V. Gupta to R. Mulry, "Re: Covenant Dove – IRS Question" (Sept. 30, 2015 at 11:22 a.m.). |