Andrew Zollinger, State Bar No. 24063944
andrew.zollinger@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201-4629
Telephone: (214) 743-4500
Facsimile: (214) 743-4545

*Counsel For The Debtors*

Thomas R. Califano (admitted *pro hac vice*)
Dienna Corrado (admitted *pro hac vice*)
thomas.califano@dlapiper.com
dienna.corrado@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

Daniel M. Simon (admitted *pro hac vice*)
daniel.simon@dlapiper.com
DLA Piper LLP (US)
One Atlantic Center
1201 West Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 736-7800
Facsimile: (404) 682-7800

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| 4 West Holdings, Inc. *et al.*,[1] | § | Case No. 18-30777 (HDH) |
| | § | |
| Debtors. | | (Jointly Administered) |

---------------------------------------------------------------------------------------------------------------------

---

[1]      A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, is attached to the Motion for Summary Judgment ("Motion") as App. Ex. A at AAP0018-AAP0022.

4 WEST HOLDINGS, INC. et al.,[2]            §
                                            §
            Plaintiffs,                     §      ADV. PRO. 18-03237 (HDH)
                                            §
v.                                          §
                                            §
OMEGA HEALTHCARE INVESTORS, INC.            §
et al.,[3]                                  §
                                            §
            Defendants.

## PLAINTIFFS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

[2]      A list of the Plaintiffs in this adversary proceeding is attached to the Motion as App. Ex. B at AAP0023-AAP0025.

[3]      A list of the Plaintiffs in this adversary proceeding is attached to the Motion as App. Ex. C at AAP0026-AAP0028.

# TABLE OF CONTENTS

**Page**

SUMMARY.................................................................................................................1

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF UNDISPUTED FACTS.................................................................4

    A.    Overview of the Company .........................................................................4

    B.    2013 Merger and the Omega Transaction ..................................................5

    C.    The IRS Treatment of the Omega Transaction Confirms It Is a Financing Arrangement ............................................................................6

    D.    The Terms of the Master Leases Confirm They Are Financing Arrangement ............................................................................8

        1.    Rental Payments Were Calculated to Ensure Particular Return on Omega's Investment, Not for Use of Real Property .................................8

        2.    The "Rent" was Calculated as the Amount Necessary to Finance the Merger and Sale Leaseback Transaction ...............................................9

        3.    The Facilities Were Purchased by Omega Specifically for the Debtors to Operate.....................................................................10

        4.    The Transaction was Structured as Purported Leases to Secure Certain Tax Advantages ......................................................10

        5.    The Tenant Debtors Assume Many of the Obligations Normally Associated With Outright Ownership ...................................................11

        6.    The Tenant Debtors Have the Obligation to Pay Rent Even if it Does not Have Use of the Facilities. ....................................................14

        7.    The Economic Value of the Property is Exhausted at the End of the Lease. .....................................................................14

        8.    The Tenant Debtors Have Purchase Option for a Nominal Amount At the End of Lease Term. ...................................................15

ARGUMENT............................................................................................................16

I.    STANDARD OF REVIEW .................................................................................16

II.    THE MASTER LEASES ARE NOT TRUE LEASES BUT DISGUISED FINANCING AGREEMENTS. .................................................................18

    A.    The Parties Intended the Master Leases to be Financing Arrangements and Not True Leases ....................................................20

    B.    The Master Leases Constitute Security Interests Pursuant to Delaware Law..........................................................................22

    C.    The Economic Realities Additionally Confirm the Master Leases are Not True Leases.........................................................................23

CONCLUSION........................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................................................17

*Armstrong v. Am. Home Shield Corp.*,
333 F.3d 566 (5th Cir. 2003) .....................................................................................17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .............................................................................................17, 18

*Computer Sciences Corp. v. Sci-Tek, Inc.*,
367 A.2d 658 (Del. Sup. 1976) ..................................................................................18

*In re Dena Corp.*,
312 B.R. 162 (Bankr. N.D. Ill. 2004) ........................................................................20

*Eason v. Thaler*,
73 F.3d 1322 (5th Cir. 1996) .....................................................................................17

*Forsyth v. Barr*,
19 F.3d 1527 (5th Cir. 1994) .....................................................................................17

*Helvering v. F&R Lazarus & Co.*,
308 U.S. 252 (1939) ...................................................................................................25

*In re Hotel Syracuse, Inc.*,
155 B.R. 824 (Bankr. N.D.N.Y. 1993)........................................................................20

*In re Independence Village Inc.*,
52 B.R. 715 (Bankr. E.D. Mich. 1985)........................................................................23

*Int'l Trade Adm v. Rennsselaer Polytechnic Inst.*,
936 F.2d 744 (2d Cir. 1990) ......................................................................................25

*Liona Corp., N.V. v. PCH Assoc. (In re PCH Assoc.)*,
949 F.2d 585 (2d Cir. 1991) ......................................................................................24

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
475 U.S. 574 (1986) ...................................................................................................17

*In re MCorp Financial, Inc.*,
122 B.R. 49 (Bankr. S.D. Tex. 1990).........................................................................18

*In re Montgomery Ward, L.L.C.*,
    469 B.R. 522 (Bankr. D. Del. 2012) ............................................................ 18, 20

*In re Oerke*,
    63 B.R. 1 (Bankr. N.D. Tex. 1986) .................................................................... 20

*Philadelphia Indemnity Ins. Co. v. Creative Young Minds, Ltd.*,
    No. 3:08-CV-1827-L, 2009 WL 5171733 (N.D. Tex. Dec. 29, 2009)............................ 16, 17

*Ragas v. Tennessee Gas Pipeline Co.*,
    136 F.3d 455 (5th Cir. 1998) ............................................................................ 17

*In re Realia, Inc.*,
    No. ADV. 2:10-00962, 2012 WL 833372 (B.A.P. 9th Cir. Mar. 13, 2012),
    *aff'd*, 569 F. App'x 544 (9th Cir. 2014) ............................................................ 20

*USA Financial Services, LLC v. Young's Funeral Home, Inc.*,
    C.A. No. U607-11-102; 2010 WL 3002063 (Del. Ct. Common Pleas June 24,
    2010)............................................................................................................ 18, 22

*In re Winston Mills, Inc.*,
    6 B.R. 587 (Bankr. S.D.N.Y. 1980) .................................................................. 24

**Statutes**

6 DEL. ADMIN. CODE § 1-203(a) (2018) .................................................................... 18

Bankruptcy Code Section 365 ...................................................................................... 18

DEL. ADMIN. CODE § 1-203(b) (2018) ...................................................................... 19

**Other Authorities**

FED. R. BKR. PROC. 7056(c).......................................................................................... 1, 16

Fed. R. Civ. P. 56(c)...................................................................................................... 16

FED. R. CIV. P. 56(c)(2) ................................................................................................ 1, 16

## SUMMARY

Plaintiffs 4 West Holdings, Inc. et al. (collectively "Plaintiffs" or "Debtors") respectfully submit this brief in support of their motion pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56, seeking an order granting summary judgment against Defendants Omega Healthcare Investors, Inc. et al. ("Defendants") on Count I of the Complaint for Declaratory Judgment dated July 27, 2018.

## PRELIMINARY STATEMENT

Prior to the commencement of these cases (the "Petition Date"), the Debtors entered into a restructuring support agreement (the "Restructuring Support Agreement"), by and among the Debtors, certain defendants, all of which are affiliates of Omega Healthcare, Inc. (collectively, "Omega"), and SC-GA 2018 Partners, LLC (the "Plan Sponsor") which was intended to provide a path to a concessional reorganization.[4] Among the many compromises embodied in the RSA was an agreement by Omega to provide debtor in possession financing ("DIP Financing") and support by all parties of two transactions:

> (i) the "Transfer Transaction" involving the transition of certain facilities (the "Transfer Portfolio") to new operators designated by Omega, pursuant to a settlement entered into and approved by the Court on May 14, 2018 [Docket No. 375] (the "9019 Settlement Order")[5]; and

> (ii) the "Restructuring Transaction" whereby the remaining facilities and Debtor Palladium Hospice and Palliative Care, LLC (which provides hospice and palliative care) would be "deemed recharacterized" and transferred to the Plan Sponsor pursuant to a stock purchase agreement under the terms of the Plan, in exchange for $195 million in cash and a $30 million subordinated note issued to Omega.

Only one of these transactions—the Transfer Transaction—has closed, with approximately 60% of the Transfer Portfolio already transitioned to operators designated by

---

[4]     The Debtors reserve all rights to claims that Omega breached the RSA.

[5]     The 9019 Settlement Order is the subject of an appeal filed by the Committee that is currently pending in the United States District Court for the District of Texas (Case No. 18-cv-01310).

Omega, the balance of the Transfer Portfolio is currently in the process of transfer. Additionally, the Debtors' former headquarters in Memphis has been sold with the proceeds of such sale having been paid to Omega. Following Omega's purported termination of the RSA (a termination which the Debtors believe is improper and directly attributable to conduct by Omega), the Debtors are forced to seek the recharacterization of the Master Leases (as defined below) to which Omega previously agreed. Once the Master Leases are recharacterized, it will be clear that Omega has appropriated in excess of $175 million in value post-petition while attempting to deny the Debtors a viable plan and exit and to leave these estates administrating insolvent. Absent the relief requested herein, Omega will be permitted to strip the Debtors' estates of all value to the detriment of all estate constituents.

In this adversary proceeding, Plaintiffs seek a declaratory judgment that its leases with Defendants in connection with approximately 38 facilities ("the Properties") governed by two Master Leases (together, the "Master Leases") was a financing transaction—not a true lease— and, therefore, the Subject Property governed by the Master Leases remains part of the Debtors' estate. The Debtors also intend to file a motion seeking a valuation of the Subject Property and finding that the value of the Property transferred to Defendants in connection with the Transfer Portfolio more than satisfies all of Plaintiffs' obligations to Defendants in connection with the DIP Financing and Working Capital Line provided by Defendants.

This Court can resolve this proceeding on summary judgment because the evidence overwhelmingly and uniformly demonstrates that the "leases" were actually financing arrangements. Indeed, every factor that courts typically consider when undertaking this analysis weighs entirely in the Debtors' favor. Furthermore, Omega's public statements at the time the Master Leases were entered into, as well as statements provided to governmental authorities

since that time, statements intended to be provided to governmental authorities establish that Omega at all times believed the Master Leases were Leases in name only, and were in fact disguised financings. Those factors include, without limitation:

(a)   If the rental payments were calculated to ensure a particular return on an investment (as opposed to compensate the landlord for the use of the land);

(b)   If the purchase price was calculated as the amount necessary to finance the transaction (as opposed to being related to the fair market value of the land);

(c)   If the property was purchased by the lessor specifically for the lessee's use;

(d)   If the transaction was structured as a lease to secure certain tax advantages;

(e)   If the lessee assumes many of the obligations normally associated with outright ownership;

(f)   If the tenant has the obligation to pay rent despite not getting beneficial use of the property;

(g)   If the economic value of the property is exhausted at the end of the lease; and

(h)   If the lessee has the right to buy the property for a nominal amount at the end of the lease, or the obligation to purchase the property.

As shown below, the Master Leases contain specific provisions that weigh in favor of each of these factors, and are strongly indicative that the Master Leases are in fact disguised financing arrangements and not true leases.

In addition to examining the provisions contained within the purported leases, courts routinely examine the parties' intent to an agreement if the true nature of the agreement is at issue. Here, it is clear based on statements made by both parties contemporaneous to the transactions at issue that they considered the Master Leases to be a secured financing as opposed to a true lease.

Finally, pursuant to Delaware law, a lease is deemed to be a financing arrangement when (a) the consideration that the lessee must pay for the right of possession or use is an obligation for the term of the lease and is not subject to termination by the lessee, and (b) one of the following additional conditions is met: (i) the original lease term is equal to or greater than the remaining economic life of the goods; (ii) the lessee is either bound to renew the lease for the remaining economic life of the goods or to become the owner of the goods; (iii) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration; or (iv) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration. An examination of the relevant factors reveals that the Master Leases are not "true leases" pursuant to the Bankruptcy Code, and, thus, the value of the Subject Property should revert to the Debtors' Estate.

Based on the overwhelming evidence and the unambiguous terms of the agreement, as well as statements made by Defendants reflecting their intent at the time, Plaintiffs respectfully request that this Court grant their Motion for Summary Judgment. For the reasons stated in their accompanying motions, Plaintiffs further request that this Court declare as a matter of law that the transactions at issue constitute financing arrangements and not true leases.

## STATEMENT OF UNDISPUTED FACTS[6]

### A. Overview of the Company

As of the Petition Date, 4 West and its affiliated Debtors operate 41 skilled nursing facilities located in the six states of Georgia, Mississippi,[7] North Carolina, South Carolina,

---

[6] The facts recited herein are set forth in the accompanying Declaration of Trey Blalock dated July 27, 2018, which is attached to the Motion as App. Ex. D at AAP0029-AAP0569.

[7] The Mississippi facilities were transferred as part of the Transfer Portfolio, effective July 1, 2018.

Tennessee and Virginia (each, a "Facility")[8] and is the manager of a Facility in Indiana. As of the Petition Date, the Debtors employ approximately 5,000 employees, including but not limited to, nurses, nursing assistants, social workers, regional directors and supervisors.

The activities and business affairs of the Debtors generally fall into three categories: (i) holding companies that directly or indirectly hold a portfolio of certain assets, (ii) entities that are tenants under the Master Leases with the Omega Parties (the "Tenant Debtors"), and (iii) entities which are subtenants under the subleases with the Tenant Debtors and operate the Facilities (the "Operating Debtors").[9] The Master Leases serve as financing arrangements pursuant to which the Company is to repay the funds borrowed from the Defendants under the Sale Leaseback described below.

**B.      2013 Merger and the Omega Transaction**

The Company's corporate history began with the formation of 4 West Holdings in August 2013 in connection with the acquisition by merger (the "Merger") of Ark Holding Company, Inc. d/b/a Covenant Dove ("AHC")[10] pursuant to that certain Agreement and Plan of Merger, dated September 13, 2013 (the "Merger Agreement"), by and among 4 West Holdings, New Ark Investment, Inc. ("Acquisition Sub"), AHC, and Behrman Capital PEP L.P. ("Berhman Capital"), the previous owner of AHC. Upon the merger of Acquisition Sub with and into AHC, AHC remained as the surviving corporation, which is now known as Orianna Investment, Inc., a Debtor in these Chapter 11 Cases.

---

[8]      As discussed in further detail below, since the Petition Date, thirteen of the Facilities have been transferred to new operators designated by the Defendants pursuant to the 9019 Settlement.

[9]      Debtor Johns' Island Rehabilitation and Healthcare Center, LLC is an Operating Debtor but its lease is with a third party, Sea Island Comprehensive Health Care, Corp. Debtor Palladium is a separately licensed hospice and palliative care services provider that is wholly owned by Debtor Orianna Investment, Inc.

[10]      AHC was formed in 2007 by a private equity firm, Behrman Capital, to provide long-term care and rehabilitation services primarily in the Southeast region of the United States.

Upon information and belief, Omega was eager to enter the Omega Transaction and believed it would serve as a prototype for future large portfolio acquisitions. Upon information and belief, Omega saw the transaction as an opportunity to add considerable size and diversity to its portfolio, including facilities in four states in which Omega did not previously have a presence.

The closing of the Merger was conditioned upon the consummation of the Sale Leaseback Agreement with OHI Asset RO, LLC,[11] which provided the Company with the funds necessary to pay the Merger consideration. While fashioned as a purchase of the facilities by OHI Asset RO, LLC, the Sale Leaseback Agreement was actually a loan agreement and the Master Leases were the vehicles through which the loan would be repaid. Under the Sale Leaseback Agreement, the Debtors purportedly sold the real property to the Defendants for $525 million.

On September 13, 2013, the Company and the Defendant entered into the following transactions executed simultaneously: (a) the Merger Agreement; (b) the Sale Leaseback Agreement, and (c) the Master Leases. The transaction between the Debtors and Defendants is sometimes referred to as the "Omega Transaction."

C. **The IRS Treatment of the Omega Transaction Confirms It Is a Financing Arrangement**

Based on the guidance of outside tax counsel, the Company filed a Net Gain Form 4797 with the IRS in connection with its 2013 tax returns, characterizing the Omega Transaction as a financing arrangement.

---

[11] OHI Asset RO, LLC is also the entity providing the Debtors with debtor-in-possession financing in these chapter 11 cases.

In related correspondence, the IRS confirmed that the treatment of the Omega Transaction as a financing arrangement was appropriate, and sought additional information to confirm that the Company maintained the burdens of ownership after the transaction. *See* Email from R. Deboise to A. Whitlock, "Requests" (Sept. 21, 2015 at 3:37 p.m.), a true and correct copy of which is attached as Ex. 6 to Trey Blalock Decl., App. Ex. D at APP402- APP407.

In responding to the IRS inquiry, Defendant and the Company jointly submitted the following information, confirming the Omega Transaction is a financing arrangement:

*Does Omega Healthcare retain significant control over the leased property?*

No. Omega Healthcare does not retain significant control over the leased property. The tenant under each of the four (4) Master Lease Agreements (each, a "Master Lease") was granted the right to exclusively occupy the premises until November 30, 2063 (See Section 1.3 of the Master Lease). Additionally, at the conclusion of the lease term the tenant under each Master Lease has an option to purchase the leased property for $10.00 (See definition of "Tenant Buyout Price" in Section 1.4 of the Master Lease). The tenant is solely responsible for all maintenance and repair of the leased premises, and for the payment of all utilities, taxes, fees and other impositions applicable to ownership of the leased property during the term of the Master Lease (See Article 3 of the Master Lease).

*Did Omega Healthcare acquire an equity interest in the property?*

Omega holds legal title to the property, but does so solely to provide security for the repayment of the loan by the tenant. Omega does not have any equity or residual interest in the property from a substantive or economic standpoint.

*Is Omega Healthcare vested with the right of possession?*

No. Omega Healthcare is not vested with the right of possession of the property. The tenant has the sole right to occupy the leased premises during the lease term. (See Section 1.1 and 21.1 of the Master Lease).

*Which party pays property taxes after the transaction?*

The tenant is responsible to pay all taxes applicable to the leased premises during the lease term. (See Sections 3.1 and 3.2 of the Master Lease).

*Which party bears the risk of economic loss or physical damage to the property?*

The tenant bears the cost of repair for damage to or destruction of the leased property (See Section 9.1, 9.4 and 9.10 of the Master Lease). Section 9.4 of the

Master Lease requires the tenant to repair, rebuild or restore any damaged property at the tenant's expense. Section 9.5 requires the tenant to deposit with the landlord any amount needed for repairs in excess of insurance proceeds. In addition, there is no rent abatement as a result of any damages to the property.

*See id.*

### D. The Terms of the Master Leases Confirm They Are Financing Arrangement

The following provisions in the Master Leases demonstrate that the parties in fact intended for the transaction to be a financing arrangement.

#### 1. Rental Payments Were Calculated to Ensure Particular Return on Omega's Investment, Not for Use of Real Property

The payments required to be made by the Company to the Defendant under the Master Leases were computed to provide the Defendant with a return on its $525 million loan. The South East Master Lease and Indiana Master Lease include amortization schedules, which is akin to a secured financing. Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0145-AAP0163, AAP0372-AAP0390 Sched. 2.

Notably, Omega's 10-K for 2016 (the "2016 Omega 10-K") states:

"[o]n November 27, 2013, we closed an aggregate $529 million purchase/leaseback transaction in connection with the acquisition of Ark Holding Company, Inc. ("Ark Holding") by 4 West Holdings Inc. At closing, we acquired 55 SNFs and 1 ALF operated by Ark Holding and leased the facilities back to Ark Holding, now known as New Ark Investment Inc. ("New Ark"), pursuant to four 50-year master leases with **rental payments yielding 10.6% per annum over the term of the leases. The purchase/leaseback transaction is being accounted for as a direct financing lease**. The lease agreements allow the tenant the right to purchase the facilities for a bargain purchase price plus closing costs at the end of the lease term. **In addition, commencing in the 41st year of each lease, the tenant will have the right to prepay the remainder of its obligations thereunder for an amount equal to the sum of the unamortized portion of the original aggregate $529 million investment plus the net present value of the remaining payments under the lease and closing costs**. In the event the tenant exercises either of these options, we have the right to purchase the properties for fair value at the time. . . . Additionally, **we own** four facilities and lease them to New Ark under [the Laurel Baye] master lease which expires in 2026. The four facility lease is being accounted for as an operating lease."

Significantly, Omega's language with respect to the Laurel Baye Master Lease (which the Debtors admit is a true operating lease and is not subject of the Adversary Complaint) contrasts with the description of the other properties with the Debtors and with respect to which it only has a purchase option to purchase at fair market value at the end of the lease.  Ex. 11 to Trey Blalock Decl., App. Ex. D at AAP0531.

### 2. The "Rent" was Calculated as the Amount Necessary to Finance the Merger and Sale Leaseback Transaction

The payments made by the Tenant Debtors to Omega under the Master Leases were calculated based on the amount the Company borrowed to obtain the Property and not based on the fair market rental value of the Property.  The payments required to be made by the Company to Omega under the Master Leases were payments of interest on the $525 million loan from the Defendant.  The South East Master Lease and Indiana Master Lease include amortization schedules, which indicate a secured financing arrangement.  *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0145- AAP0163, AAP0372- AAP0390 Sched. 2.  Additionally, each of the Master Leases state that the "rent" should be considered payment of interest and principal under the Master Leases for tax purposes.  *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0129, AAP0360 §23.1.

These provisions show that the Defendant computed the payments to earn a return on its investment, which is another indication that the Omega Transaction is a financing and not a lease.

Furthermore, at least with respect to the South East Master Lease, Omega previously sold one of the facilities that was leased under the South East Master Lease and at around the same time funded renovations to another one of the facilities under that same Master Lease.  *See* Ex. 4 to Trey Blalock Decl., App. Ex. D at AAP0061, AAP0292 Recitals.  The rent was adjusted to

reflect an increase on account of the funding and a decrease in the amount of the sale proceeds. *See* Ex. 4 to Trey Blalock Decl., App. Ex. D at AAP0081-AAP0087 Art. 4. This demonstrates that (a) an actual loan was issued through the lease, and (b) the tenant received the value of the sale proceeds as a true owner would.

### 3. The Facilities Were Purchased by Omega Specifically for the Debtors to Operate

Omega acquired all of the property that is the subject of the South East and Indiana Master Leases pursuant to the Sale Leaseback Transaction specifically for the purpose of leasing it back to the Company. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0061, AAP0292 Recitals.

### 4. The Transaction was Structured as Purported Leases to Secure Certain Tax Advantages

The South East Master Lease and Indiana Master Lease specifically state that the transaction was entered into in order to secure certain tax advantages. Each of the Master Leases state that the "rent" should be considered payment of interest and principal under the Master Leases for tax purposes. Specifically, such leases provide that the "Sale Leaseback Agreement together with this lease shall be treated by the Parties for (i) all federal, state and local income tax purposes as a secured financing arrangement, and (ii) GAAP accounting purposes as a capital lease." *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0129, AAP0360 § 23.1.[12]

Article 23 of the Master Lease provides, in pertinent part, that:

> 23.1 <u>Tax Treatment of Lease</u>. Landlord and Tenant hereby acknowledge and agree, and covenant that the acquisition of the Leased Property pursuant to the Sales Leaseback Agreement together with this Lease shall be treated by the Parties for (i) all federal, state and local income tax purposes as a secured financing agreement, and (ii) GAAP accounting purposes as a capital lease. As

---

[12] A memorandum from the law firm of Greenberg Traurig to Trey Blalock dated July 25, 2013 (the "<u>GT Memo</u>"), a true and correct copy of which is attached as Ex. 7 to Trey Blalock Decl., App. Ex. D at AAP0408-AAP0411, shows that tax considerations were taken into account in structuring the transaction.

such, Landlord and Tenant shall, for all federal, state and local income tax purposes, treat (a) the amounts paid by the Landlord in connection with the acquisition of the Leased Property as a loan to the Tenant, (b) Landlord and Tenant shall classify and characterize all payments of Rent made hereunder as payments of principal and interest in accordance with the amortization schedule as initially set forth on Schedule 2 attached hereto…(c) Tenant shall continue to claim depreciation with respect to the Lease Property based on its historic tax books and records, and (d) Landlord and Tenant shall file all income tax return or associated documents on a basis consistent with such classification and characterization.

The characterization of the Company's payments under the Master Leases as interest indicates that the each Master Lease is a financing and not a true lease.

Furthermore, the 2016 Omega 10-K also states that, generally, it enters into its lease transactions for tax purposes and that there is a risk that the Internal Revenue Service can seek to treat such leases as "secured financing transactions in which the lessees are owners of the facilities and [Omega is] merely a secured creditor." Ex. 11 to Trey Blalock Decl., App. Ex. D at AAP0435.

### 5. The Tenant Debtors Assume Many of the Obligations Normally Associated With Outright Ownership

Under Section 1.3 of the Master Leases, the Company was given the right to exclusively occupy the Property until November 30, 2063.

Additionally, under the Master Leases, the Tenant Debtors bear the risk of loss in the event of casualty or condemnation, and are required to repair, rebuild or restore any damaged property at the Company's expense. *See, e.g.*, Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0098- AAP0099, AAP0329- AAP0330 §§ 9.1 (Notice of Casualty), 9.4 (Restoration), 9.5 (Insufficient Proceeds).

These obligations assumed by the Company reflect ownership in the Properties and indicate that the Omega Transaction is a financing and not a lease.

The Tenant Debtors are also required to pay, among other things, the amounts owed for "impositions", and require the Tenant Debtors' payment of, among other things, taxes, assessments, utilities, insurance, taxes and maintenance. In pertinent part, the Master Leases provide that:

## ARTICLE 3: IMPOSITIONS AND UTILITIES

3.1     Payment of Impositions.    Tenant shall pay, as Additional Rent, all Impositions that may be levied or become a lien on the Leased Property or any part thereof at any time (whether prior to or during the Term), without regard to prior ownership of said Leased Property, before any fine, penalty, interest, or cost is incurred; provided, however, Tenant may contest any Imposition in accordance with §3.7.

*        *        *

3.4     Utilities.    Tenant shall pay, as Additional Rent, all taxes, assessments, charges, deposits, and bills for utilities, including, without limitation, charges for water, gas, oil, sanitary and storm sewer, electricity, telephone service, and trash collection, which may be charged against the occupant of the Improvements during the Term.

3.5     Discontinuance of Utilities.    Landlord will not be liable for damages to person or property or for injury to, or interruption of, business for any discontinuance of utilities nor will such discontinuance in any way be construed as an eviction of Tenant or cause an abatement of rent or operate to release Tenant from any Tenant's obligations under this Lease.

3.5     Business Expenses.    Tenant acknowledges that it is solely responsible for all expenses and costs incurred in connection with the operation of the Facility on the Leased Property, including without limitation, employee benefits, employee vacation and sick pay, consulting fees, and expenses for inventory and supplies.

*        *        *

## ARTICLE 4: INSURANCE

4.1     General Insurance Requirements.    At all times through the Term of this Lease, Tenant shall, at Tenant's sole cost and expense, maintain or cause to be maintained the following insurance coverages with respect to the Premises:

(a) Property insurance against loss or damage caused by fire, casualty and other hazards covered by an "all-risk" or "special" cause of loss policy…

*        *        *

(b)    Business income or business interruption insurance, including rental value/leasehold interest coverage, and "Extra Expense" coverage, applicable at least to the same perils covered by the property insurance required pursuant to Section 4.1(a) above, and also meeting the following requirements:

\*    \*    \*

## ARTICLE 7: MAINTENANCE AND MECHANICS' LIENS

7.1    <u>Maintenance</u>.   Tenant shall maintain, repair, and replace the Leased Property, including, without limitation, all structural and nonstructural repairs and replacements to the roof, foundations, exterior walls, HVAC systems, equipment, parking areas sidewalks, water, sewer and gas connections, pipes and mais. Tenant shall pay, as Additional Rent, the full cost of maintenance, repairs, and replacements.   Tenant shall maintain all drives, sidewalks, parking areas, and lawns on or about the Leased Property in a clean and orderly condition, free of accumulations of dirt, rubbish, snow and ice.

7.2    <u>Required Alterations</u>.   Tenant shall, at Tenant's sole cost and expense, make any additions, changes, improvements or alternations to the Leased Property, including structural alterations, which may be required by any governmental authorities, including those required to maintain licensure or certification under the Medicare and Medicaid programs (if so certified), whether such changes are required by Tenant's use, changes in the law, ordinances, or governmental regulations, defects existing as of the date of this Lease, or any other cause whatsoever.

As required under the Master Leases, the Tenant Debtors have paid the taxes, utilities, insurance, and maintenance.

These obligations assumed by the Tenant Debtors reflect ownership in the property and indicate that the Omega Transaction is a financing and not a lease.

Furthermore, one of the Debtors' facilities located in Colliersville, Tennessee that is leased from an Omega Landlord under the South East Master Lease is also the subject to a ground lease between the ground landlord and Omega.   *See* Ex. 4 to Trey Blalock Decl., App. Ex. D at AAP0136 § 25.27.   The South East Master Lease provides that the tenant must pay all amounts due under the ground lease directly to the ground lease landlord.   *See id.*

**6.** **The Tenant Debtors Have the Obligation to Pay Rent Even if it Does not Have Use of the Facilities.**

In each of the Master Leases, the risk of loss is on the Tenant Debtors in the event of a casualty or condemnation. After condemnation or destruction of the Properties, the Master Leases do not permit the tenants to abate any amount of rent, even though they will not be receiving full, or potentially any, beneficial use of the property. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0098-AAP0101, AAP0102-AAP0103, AAP0331-AAP0332, AAP0331-AAP0334 §§ 9.9, 9.10, 10.4.

Further, if a casualty or complete taking destroys the entire property, or results in the tenant not being able to use the property for the purposes it was previously used for, for 120 days following such event, the Master Leases require the Tenant Debtors to submit an irrevocable, rejectable written offer to purchase the Omega landlord's interest in the property, which purchase price to be equal to the "Facility Transfer Price" or "Offer Price" as of a specified proposed purchase date. Such price is equal to the current month's rent, plus the net present value of the remaining base rent, plus Omega's costs and expenses of the transfer. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0100-AAP0101, AAP0102-AAP0103, AAP0331-AAP0332, AAP0333-AAP0334 §§ 9.10, 10.4.

**7.** **The Economic Value of the Property is Exhausted at the End of the Lease.**

The SE Master Lease and Indiana Master Lease are both long term (50 year) leases. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP062, AAP0293 § 1.3. Moreover, as described in further detail below, the Tenant Debtors have a purchase option after forty (40) years for a nominal $10.00. Forty (40) years is approximately the useful life of the Facilities.[13]

---

[13]     The <u>GT Memo</u> states that "[t]he proposal from Omega includes a provision that at the end of the 40 year term, beneficial ownership of the real estate would effectively be transferred and legal title would remain with

**8.    The Tenant Debtors Have Purchase Option for a Nominal Amount At the End of Lease Term.**

The SE Master Lease and Indiana Master Lease each contain a purchase option in favor of the Tenant Debtors, which permit the Tenant Debtors to purchase the Facilities after 40 years with the purchase price calculated to include the remaining lease payments plus certain fees and expenses. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0106, AAP0337 §§ 12.3, 12.4.

The Master Leases provide, in pertinent part, that:

12.1 <u>Tenant Option to Purchase</u>. In consideration of the execution of the Lease, subject to the terms and conditions set forth below, Landlord hereby grants to Tenant the option (the "<u>Tenant Option</u>") to buy the Tenant Option Property (as that term is defined below) in accordance with, and subject to the terms and conditions of, this Article. The Tenant Option may be exercised only with respect to all of the Tenant Option Property, and may not be exercised in part or with respect to less than all the Tenant Option Property. In addition, in order to exercise the Tenant Option, the "Tenant Option" under each of the Related Leases must be exercised concurrently with the Tenant Option.

12.2    <u>Option Property.</u> The "<u>Tenant Option Property</u>" means all of the Landlord's right, title and interest in the Leased Property but excluding [certain items].

12.3 <u>Exercise of Option</u>. During the Term, Tenant may exercise the Tenant Option at any time after the end of the fortieth (40th) Lease Year and prior to ninetieth (90) day prior to the end of the Term (the "<u>Tenant Option Period</u>"); provided, however, that Tenant may not exercise the Tenant Option at any time when an Event of Default or Unmatured Event of Default has occurred or is continuing. Tenant shall exercise the Tenant Option by delivering Notice thereof to Landlord during the Tenant Option Period, together with a non-refundable deposit in the amount of equal to five percent (5%) of the Tenant Buyout Price (the "<u>Tenant Option Deposit</u>"). The Tenant Option Deposit shall be deemed to be fully earned by Landlord upon Landlord's receipt thereof, and shall only be returned to Tenant under certain circumstances as more particularly set forth below.

12.4 <u>Buyout Price.</u> If Tenant exercises its option to purchase the Tenant Option Property as set forth in this Lease, the purchase price for the Tenant

---

Omega. Omega has argued that the useful life of the property is 40 years, and that, as a result, the value of the property at the end of 40 years is zero." *See* Ex. 7 to Trey Blalock Decl., App. Ex. D at AAP0409- AAP0410.

Option Property shall be the Tenant Buyout Price. The Tenant Buyout Price shall be payable by Tenant in immediately available funds at closing. The Tenant Option Deposit shall be applied against the Tenant Buyout Price at closing. Tenant shall also pay the cost of any revenue or transfer stamps required to be affixed to the deeds, and all reasonable expenses, disbursements and reasonable attorneys' fees incurred by Landlord in the sale transaction.

Significantly, if the sale closes in the last month of the lease term, the purchase price is a nominal amount of $10. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0106, AAP0337 §§ 12.3, 12.4. The fact that the purchase price is linked to the remaining lease payments demonstrates that the lease payments were calculated to compensate the purported "landlord" for the cost of the land and not the fair market value of use of such property.

Moreover, if a Tenant Debtor exercises its purchase option, the applicable "Omega Landlord" may buy the Tenant Debtor's rights under the option for fair market value of the property. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0108, AAP0339 § 12.10. The fact that the Omega Landlord would have to pay fair market value of the property indicates that the property is owned by the Tenant Debtors and that the Omega Landlord is in fact exercising an option to purchase from the Tenant Debtors.

The nominal Option Purchase Price is indicative of a financing and not a lease.

## ARGUMENT

### I. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to Bankruptcy Court adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2); FED. R. BKR. PROC. 7056(c); *Philadelphia Indemnity Ins. Co. v. Creative Young Minds, Ltd.,* No. 3:08-CV-1827-L,

2009 WL 5171733 at *2 (N.D. Tex. Dec. 29, 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986)). A dispute regarding a material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Philadelphia Indemnity*, 2009 WL 5171733 at *2.

For a "no evidence" summary judgment motion, the moving party is not required to negate the nonmoving party's claims or present evidence proving the absence of a material fact; rather, the moving party may meet its burden by simply "pointing to an absence of evidence to support the nonmoving party's case." *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (finding "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim").

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports its claim. *See Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *See Celotex*, 477 U.S. at 322-23.

Simply labeling an agreement a "lease" does not necessarily create a true lease. *In re Montgomery Ward, L.L.C.*, 469 B.R. 522, 528. As demonstrated below, the evidence overwhelmingly and uniformly proves that the Master Lease Agreements between the parties constituted financing transactions and not true leases. Accordingly, Section 365 of the Bankruptcy Code does not apply to the Master Lease Agreements and Plaintiffs' Motion for Summary Judgment should be granted.

## II. THE MASTER LEASES ARE NOT TRUE LEASES BUT DISGUISED FINANCING AGREEMENTS.

To determine whether the parties have entered into a "true lease," bankruptcy courts in this Circuit look to the state law that governs the agreement. *See In re MCorp Financial, Inc.*, 122 B.R. 49, 52 (Bankr. S.D. Tex. 1990) ("State law determines whether an agreement is a lease") (quoting *In re Harris Pine Mills*, 862 F.2d 217, n.5 (9th Cir. 1988)). The Master Leases are governed by Delaware law. Therefore, the Court should apply Delaware law to determine whether the Master Leases are true leases.

Title 6, section 1-203(a) of the Delaware Code provides that determination of whether a transaction in the form of a lease actually creates a lease or a security interest is determined by examining the facts of each case. 6 Del. Admin. Code § 1-203(a) (2018); *see also USA Financial Services, LLC v. Young's Funeral Home, Inc.*, C.A. No. U607-11-102; 2010 WL 3002063 (Del. Ct. Common Pleas June 24, 2010) (holding agreement constituted a secured financing as opposed to a true lease). This determination requires the court to look beyond the

face of the agreement and view the nature of the transaction in its entirety. *Computer Sciences Corp. v. Sci-Tek, Inc.*, 367 A.2d 658, 660 (Del. Sup. 1976) (holding examination of the entire transaction showed lease was intended as a security device).

Under Delaware law, a transaction creates a security interest and not a "true lease" if (a) the consideration that the lessee must pay for the right of possession or use is an obligation for the term of the lease and is not subject to termination by the lessee, and (b) one of the following additional conditions is met: (i) the original lease term is equal to or greater than the remaining economic life of the goods; (ii) the lessee is either bound to renew the lease for the remaining economic life of the goods or to become the owner of the goods; (iii) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration; or (iv) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration. 6 DEL. ADMIN. CODE § 1-203(b) (2018). The Delaware Code further defines "nominal additional consideration" as consideration that "is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised." *Id.* "Remaining economic life of the goods" means "an amount "determined with reference to the facts and circumstances at the time the transaction is entered into." *Id.*

Bankruptcy courts generally look to the "economic reality" of the agreement at issue to determine its true nature. Under the "economic realities" test, the following factors have been found to weigh in favor of recharacterization of a lease to secured debt:

(a) If the rental payments were calculated to ensure a particular return on an investment (as opposed to compensate the landlord for the use of the land);

(b) If the purchase price was calculated as the amount necessary to finance the transaction (as opposed to being related to the fair market value of the land);

(c)     If the property was purchased by the lessor specifically for the lessee's use;

(d)     If the transaction was structured as a lease to secure certain tax advantages;

(e)     If the lessee assumes many of the obligations normally associated with outright ownership;

(f)     If the tenant has the obligation to pay rent despite not getting beneficial use of the property;

(g)     If the economic value of the property is exhausted at the end of the lease; and

(h)     If the lessee has the right to buy the property for a nominal amount at the end of the lease, or the obligation to purchase the property.

*See, e.g.*, *In re Montgomery Ward, L.L.C.*, 469 B.R. 522, 530 (Bankr. D. Del. 2012); *In re Dena Corp.*, 312 B.R. 162, 170 (Bankr. N.D. Ill. 2004); *In re Hotel Syracuse, Inc.*, 155 B.R. 824, 838 (Bankr. N.D.N.Y. 1993); *see also In re Realia, Inc.*, No. ADV. 2:10-00962, 2012 WL 833372, at *7 (B.A.P. 9th Cir. Mar. 13, 2012), *aff'd*, 569 F. App'x 544 (9th Cir. 2014) (applying the "economic realities" test to a lease governed by Delaware law).

Here, the examination of the sale-leaseback transaction in its entirety mandates a finding that the Master Leases are secured financings, and not "true leases."

### A.     The Parties Intended the Master Leases to be Financing Arrangements and Not True Leases

Courts routinely look to the intent of the parties to an agreement if the true nature of the agreement is at issue. *See In re Oerke*, 63 B.R. 1, 1–2 (Bankr. N.D. Tex. 1986) (holding that "the keys to determining whether a lease agreement is a security agreement or a true lease include the parties' intent in the light of the facts and circumstances of each case"). Here, contemporaneous statements of Defendants and the Defendants' agents unquestionably

demonstrate that the parties intended for this transaction to be a financing arrangement as opposed to a true lease. For example:

- On August 14, 2013, Taylor Pickett, Chief Executive Officer of Defendant Omega Healthcare Investors, Inc. stated in an e-mail to Harris Schwartzberg that the transaction was a "lease finance structure" and stated that "Jeffries … have scheduled a call with our lawyers to make sure they understand that *it is a financing* (via a capital lease)" (emphasis added). *See* Ex. 8 to Trey Blalock Decl., App. Ex. D at AAP0413.

- On September 13, 2013, Eliot Robinson, an attorney for Defendants, stated in an e-mail to Taylor Pickett and others relating to the proposed sale-leaseback transaction "*Omega is providing the financing*." (emphasis added). *See* Ex. 9 to Trey Blalock Decl., App. Ex. D at AAP0415.

- On September 30, 2015, Vikas Gupta, on behalf of Defendants, stated in an e-mail to Raymond Mulry that he recommended making the following statement in response to a question from the IRS relating to the transaction "Omega holds legal title to the property, *but does so solely to provide security for repayment of the loan by the tenant.* Omega does not have any equity or residual interest in the property form a substantive or economic standpoint." (emphasis added). Ex. 10 to Trey Blalock Decl., App. Ex. D at AAP0418.

- Defendants stated in their 10-K filing for 2016: "On November 27, 2013, we closed an aggregate $529 million purchase/leaseback transaction in connection with the acquisition of Ark Holding Company, Inc. ("Ark Holding") by 4 West Holdings Inc. At closing, we acquired 55 SNFs and 1 ALF operated by Ark Holding and leased the facilities back to Ark Holding, now known as New Ark Investment Inc. ("New Ark"), pursuant to four 50-year master leases with rental payments yielding 10.6% per annum over the term of the leases. The purchase/leaseback transaction is being accounted for as a direct financing lease. The [South East and Indiana] lease agreements allow the tenant the right to purchase the facilities for a bargain purchase price plus closing costs at the end of the lease term. In addition, commencing in the 41st year of each lease, the tenant will have the right to prepay the remainder of its obligations thereunder for an amount equal to the sum of the unamortized portion of the original aggregate $529 million investment plus the net present value of the remaining payments under the lease and closing costs. In the event the tenant exercises either of these options, we have the right to purchase the properties for fair value at the time. . . . Additionally, we own four facilities and lease them to New Ark under [the Laurel Baye] master lease which expires in 2026. The four facility lease is being accounted for as an operating lease." *See* Ex. 11 to Trey Blalock Decl., App. Ex. D at AAP0517.

These statements irrefutably demonstrate that Defendants intended for the transaction to constitute a financing as opposed to a true lease and thus weigh heavily in favor of recharacterization.

### B. The Master Leases Constitute Security Interests Pursuant to Delaware Law

The Master Leases additionally constitute security interests pursuant to Delaware law. First, the consideration or "rent" that Plaintiffs must pay for the right of possession or use of the Subject Property is an obligation for the term of the Master Leases and is not subject to termination by the lessee. Specifically, the Master Leases provide in Section 2.6

> Except as otherwise specifically provided in this Lease, Tenant shall remain bound by this Lease in accordance with its terms. Tenant shall not, without the consent of Landlord, modify, surrender, or terminate this Lease, no seek nor be entitled to any abatement, deduction, deferment, or reduction of Rent, or setoff or recoupment against the Rent … Tenant hereby specifically waives all rights, arising from any occurrence whatsoever, which may not or hereafter be conferred upon it by law [a] to modify, surrender, or terminate this Lease or quit or surrender the Leased Property or any portion thereof; or [b] entitling Tenant to any abatement, reduction, suspension or deferment of the Rent or other sums payable by Tenant hereunder.

Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0076, AAP0307 § 2.6.

Further, the Master Leases satisfy more than one of the remaining factors analyzed pursuant to the Delaware Code. First, the original lease term of each Master Lease is 50 years, which is greater than Defendants' approximation of the expected economic life of the goods at the time of the transaction. Second, the Master Leases provide that the Tenant may purchase the Subject Property at the conclusion of the lease for the nominal amount of $10.00. This amount absolutely satisfies the "nominal additional consideration" requirement pursuant to Delaware law. *See, e.g.*, *USA Financial Services, LLC,* 2010 WL 3002063 at *2 (holding lease agreement granting lessee the right to purchase vehicle at the conclusion of lease for $1.00 constituted financing arrangement as opposed to lease pursuant to Delaware law).

**C.** **The Economic Realities Additionally Confirm the Master Leases are Not True Leases.**

Finally, an examination of the economic realities of the Master Leases confirms that the transaction is a financing. <u>First</u>, the Master Leases are both long term (50 year) leases. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP062, AAP0293 § 1.3. This factor weighs in favor of recharacterization as the evidence demonstrates that Defendants believed the remaining life of the facilities to be approximately 40 years at the time of the transaction.[14] Relatedly, each of the Master Leases contain a purchase option in favor of the Tenant Debtors, which allows the Tenant Debtors to purchase the facilities after 40 years with the purchase price calculated to include the remaining lease payments plus certain fees and expenses. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0106, AAP0337 §§ 12.3, 12.4. Significantly, if the sale closes in the last month of the lease term, the purchase price is a nominal amount of $10. *See id.* The fact that the purchase price is linked to the remaining lease payments indicates that the lease payments were calculated to compensate the landlord for the cost of the land and not the fair market value of use of such property. Furthermore, if a Tenant Debtor exercises its purchase option, the applicable "Omega Landlord" may buy the Tenant Debtor's rights under the option for fair market value of the property. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0108, AAP0339 § 12.10. The fact that the Omega Landlord would have to pay fair market value of the property suggests that the property is owned by the Tenant Debtor and that the Omega Landlord is in fact exercising an option to purchase from the Tenant Debtor. *See In re Independence Village Inc.*, 52 B.R. 715, 718 (Bankr. E.D. Mich. 1985) (determining agreement

---

[14] The <u>GT Memo</u> states that "[t]he proposal from Omega includes a provision that at the end of the 40 year term, beneficial ownership of the real estate would effectively be transferred and legal title would remain with Omega. Omega has argued that the useful life of the property is 40 years, and that, as a result, the value of the property at the end of 40 years is zero." *See* Ex. 7 to Trey Blalock Decl., App. Ex. D at AAP0409- AAP0410.

at issue was not true leases because, among other factors, the putative lessee's option to purchase the subject property was nominal and unrelated to the value of the property).

Second, in each of the Master Leases, the risk of loss is on the Tenant Debtors in the event of a casualty or condemnation, as the Tenant Debtors are required to offer to purchase the property in such circumstances and the Omega Landlord has the option to accept or reject such offer. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0100-AAP0101, AAP0102-AAP0103, AAP0331-AAP0332, AAP0333-AAP0334 §§ 9.10, 10.4.

Third, pursuant to each of the Master Leases, the Tenant Debtors are responsible for paying all utilities, insurance, taxes and maintenance, which are indicia of ownership and weigh in favor of recharacterization. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0076-AAP0087, AAP0090-AAP0091, AAP0307-AAP0318, AAP0321-AAP0322 Arts. 3, 4, 7. Furthermore, one of the Debtors' facilities located in Colliersville, Tennessee that is leased from an Omega Landlord under the South East Master Lease is also the subject to a ground lease between the ground landlord and Omega. *See* Ex. 4 to Trey Blalock Decl., App. Ex. D at AAP0136 § 25.27. The South East Master Lease provides that the tenant must pay all amounts due under the ground lease directly to the ground lease landlord. *See id.* This factor weighs in favor of a financing arrangement, and not a true lease. *See Liona Corp., N.V. v. PCH Assoc. (In re PCH Assoc.)*, 949 F.2d 585, 596 (2d Cir. 1991) ("[T]he fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than a true lease.").

Fourth, the landlord acquired all of the property that is the subject of the South East and Indiana Master Leases pursuant to a Sale Leaseback Transaction for the purpose of leasing it back to the Company. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0061,

AAP0292 Recitals. This weighs in favor of recharacterization. *See In re Winston Mills, Inc.*, 6 B.R. 587, 598 (Bankr. S.D.N.Y. 1980) (holding that the fact that the property is purchased by the lessor specifically for the lessee's use tends to prove that no true lease exists).

Fifth, the Master Leases suggest that the transaction was entered into to secure certain tax advantages as those leases state that the "rent" should be considered payment of interest and principal under the Master Leases for tax purposes. Specifically, such leases provide that the "Sale Leaseback Agreement together with this lease shall be treated by the Parties for (i) all federal, state and local income tax purposes as a secured financing arrangement, and (ii) GAAP accounting purposes as a capital lease." *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0129, AAP0360 § 23.1. The 2016 Omega 10-K also states that, generally, it enters into its lease transactions for tax purposes and that there is a risk that the Internal Revenue Service can seek to treat such leases "secured financing transactions in which the lessees are owners of the facilities and [Omega is] merely a secured creditor." Ex. 11 to Trey Blalock Decl., App. Ex. D at AAP0435.[15] With respect to the Sale/Leaseback Transaction, however, the 2016 Omega 10-K specifically states that South East Master Lease and Indiana Master Lease are subject to a "direct financing lease." [12] *See* Ex. 11 to Trey Blalock Decl., App. Ex. D at AAP0531. The Internal Revenue Service also treats such leases as secured financings. *See generally Helvering v. F&R Lazarus& Co.*, 308 U.S. 252 (1939) (allowing depreciation deductions on lease that was in reality a loan due to the economic realities of the sale-leaseback transaction).

---

[15]     Specifically, the 2016 Omega 10-K states that "[t]he availability to us of, among other things, depreciation deductions with respect to our owned facilities (which reduce our taxable income and the amount of our required dividend distributions) depends upon the determination that, for federal income tax purposes, we are the true owner of such facilities for federal income tax purposes, which is dependent on the classification of the leases to operators or our facilities as 'true leases' rather than financing arrangements for federal income tax purposes." *See* Ex. 11 to Trey Blalock Decl., App. Ex. D at AAP0517.

Sixth, the Master Leases include amortization schedules, which is akin to a secured financing. *See* Exs. 4 and 5 to Trey Blalock Decl., App. Ex. D at AAP0145-AAP0163, AAP0372-AAP0390 Sched. 2. This weighs in favor of recharacterization.

Finally, another fact that weighs in favor of recharacterization, at least with respect to the South East Master Lease, is that Omega has already sold one of the facilities that was previously leased under the South East Master Lease and at around the same time funded renovations to another one of the facilities under that Master Lease. *See* Ex. 4 to Trey Blalock Decl., App. Ex. D at AAP0061, AAP0292 Recitals. The rent was adjusted to reflect an increase on account of the funding and a decrease in the amount of the sale proceeds. *See* Ex. 4 to Trey Blalock Decl., App. Ex. D at AAP0081-AAP0087 Art. 4. This demonstrates that (a) an actual loan was issued through the lease, and (b) the tenant received the value of the sale proceeds as a true owner would. *See Int'l Trade Adm v. Rennsselaer Polytechnic Inst.*, 936 F.2d 744 (2d Cir. 1990) ("[T]he fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease….").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment and declare each of the Master Leases to be a financing agreement, and not a true lease.

*[remainder of page intentionally left blank]*

WHEREFORE, Plaintiffs respectfully request that this Court grant Plaintiff's Motion for Summary Judgment as a matter of law and granting such other and further relief as the Court may deem just and proper.

Dated: July 27, 2018                   Respectfully submitted,
Dallas, Texas

**DLA PIPER LLP (US)**

*/s/ Andrew Zollinger*
Andrew Zollinger, State Bar No. 24063944
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201-4629
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
Email: andrew.zollinger@dlapiper.com

-and-

Thomas R. Califano (admitted *pro hac vice*)
Dienna Corrado (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email: thomas.califano@dlapiper.com
        dienna.corrado@dlapiper.com
-and-

Daniel M. Simon (admitted *pro hac vice*)
One Atlantic Center
1201 West Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 736-7800
Facsimile: (404) 682-7800
Email: daniel.simon@dlapiper.com

*Counsel for the Debtors*